T.C. Memo. 2013-49

UNITED STATES TAX COURT

6611, LTD., RICARDO GARCIA, TAX MATTERS PARTNER, ET AL.,[1]
Petitioners <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos.  13088-05, 13250-05,          Filed February 14, 2013.
                    13251-05.

<u>William A. Roberts</u> and <u>Kyle R. Coleman</u>, for petitioners.

<u>Jeffrey Louis Bassin</u>, <u>Richard Hassebrock</u>, <u>Donna Leone</u>, and <u>Gary Shuler</u>,

for respondent.

---

[1] Although we did not consolidate these cases for trial, much of the testimony and many of the exhibits were common to all three.  In an order dated January 3, 2013, we consolidated 541, Ltd., Roberto Salazar, Tax Matters Partner, docket No. 13250-05, and 466, Ltd., Larry Lawrence, Tax Matters Partner, docket No. 13251-05, with the lead case for purposes of opinion.

**[*2]** MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  Three personal-injury lawyers from the Rio Grande Valley in Texas hit the jackpot in 2001 when each got paid over $1 million for their work in cases involving faulty Firestone tires.  Each tried to reduce his tax bill with a complicated transaction that featured almost perfectly offsetting bets on foreign currency.  Each of these lawyers was in the business of estimating risk and reward in evaluating every case he considered, but in this instance each sought refuge in a tax shelter whose builders used flawed designs and constructed it from bad materials that do not survive close inspection.

FINDINGS OF FACT

I.     <u>Three Valley Lawyers</u>

A.     <u>Life in the Valley</u>

"The Valley" is the four-county southernmost part of Texas just north of the Rio Grande.  It is still mostly farm and ranch land, and has shared only to a modest extent the benefits of the strong economy in other parts of Texas.  One result is that some of the local legal elite--clustered in McAllen--are unusually tight-knit.  The main actors in these cases--the tax matters partners (TMPs)[2] Larry Lawrence,

---

[2] Under the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub.

(continued...)

**[*3]** Roberto Salazar, and Ricardo Garcia--were all at one time from that city.

Salazar and Garcia are longtime friends and have worked together on several cases.

And Lawrence met Garcia through a mutual friend, Jamie Gonzalez--another

personal-injury attorney in the Valley.

      B.     <u>The Three Lawyers</u>

      1.     <u>Larry Lawrence</u>

Larry Lawrence grew up in the Valley but moved away for college. He

earned his bachelor's degree in economics from the University of Texas in Austin in

1992. He went to Loyola University Law School in New Orleans, where he took

one basic tax course and graduated in 1995.

He moved back to the Valley that year and has practiced law ever since. He

first joined the firm of Dale & Klein, LLP--doing mostly personal-injury, family,

and insurance-defense work. Lawrence had been at Dale & Klein for only about

two years when he met Jaime Gonzalez--one of the Valley's most respected

personal-injury attorneys. In January 1998 Gonzalez recruited Lawrence to join

---

[2](...continued)
L. No. 97-248, sec. 402(a), 96 Stat. at 648, any "partnership," including all the partnerships that brought these cases, must designate one of its partners as the tax matters partner (TMP) to handle its administrative issues with the Commissioner and manage any resulting litigation. Sec. 6231(a)(7). (Unless we say otherwise, all section references are to the Internal Revenue Code in effect for the year in issue.)

[*4] his firm, and Lawrence started working on products-liability and serious-accident cases. It wasn't long after that when Lawrence decided he wanted to have a bigger stake in the cases he was working on. Gonzalez wasn't ready to give him that opportunity, so Lawrence started his own firm in January 1999. Their split was amicable, and they have maintained a close professional and personal relationship ever since.

In his new firm Lawrence chose to focus his practice on personal-injury work with clients paying him on a contingency-fee basis. Contingency-fee practices have irregular cashflows, and can require large amounts of upfront money that might not return, if ever, until years later. In 1999 and 2000 Lawrence put most of his money into his practice, although he was able to set some aside in stocks and bonds. By 2000 Lawrence's law practice was doing pretty well: He reported more than $150,000 in income from his firm for that year. But the growth of his firm made his tax returns more complicated. So in 2000 he hired David Drefke, a Texas CPA. Drefke had Lawrence make an election to treat his firm as an S corporation,[3] and Drefke prepared the initial S corporation tax return,

---

[3] If a business meets the requirements of section 1361, it may elect to become an "S corporation" and pay no corporate tax. Secs. 1362(a), 1363(a); sec. 1.1361-1(b)(1), Income Tax Regs. An S corporation's income and losses, like a partnership's, flow through to its shareholders, who then pay income tax. See sec.

(continued...)

**[*5]** Form 1120S, U.S. Income Tax Return for an S Corporation, in 2000. (The Lawrences, however, didn't make any estimated tax payments for 2000.)

Drefke also helped the Lawrences set up the firm's recordkeeping system and had them use Quicken accounting software. But Drefke worked mostly with Lawrence's wife in preparing the Lawrences' 2000 returns because it was she who compiled the information for Drefke to prepare the returns. Lawrence, however, performed all the "day-to-day mechanics" of bookkeeping, and made all the investment decisions for his family and for his firm. According to Lawrence, he "work[s] at making the living, and she works at making the living worthwhile."

2.    Roberto Salazar

Roberto Salazar was the first in his family to attend college, and he graduated from the University of Illinois with a J.D./M.B.A in 1983. While in school, Salazar took some general finance and accounting courses and a basic tax class.

After law school, Salazar moved to the Valley--his parents bought a house there, and he found a job there too. He passed the Texas bar in 1983 and went to work for an attorney in Alamo, Texas, mostly doing personal-injury work. He

---

[3](...continued)
1363(b).

[*6] later moved to the Hidalgo County District Attorney's Office, and then after four years there (leaving in 1988), he opened his own practice in personal-injury and criminal law.

In the early '90s, Salazar became a municipal judge for the City of McAllen, but the position was part time and he continued his private practice, which focused on personal-injury law. Salazar has never worked on any tax cases, set up a corporation, drafted a trust, or issued an opinion letter.

For 2000 Salazar prepared his own federal income tax returns using TurboTax software. He did, however, have his accountant review the returns and give him a "stamp of approval" before he filed them. Salazar earned about $200,000 of ordinary income from his law practice for 2000. His wife worked primarily inside the home, but would occasionally act as the receptionist at Salazar's law office. Salazar himself, however, made the family's investment decisions.

3.    Ricardo Garcia

Ricardo Garcia was born in Germany while his father was stationed there as a military doctor. But when Garcia was still very young, his family moved to the Valley after his father accepted a job in McAllen. Garcia grew up there but went

[*7] away for college and law school. He graduated from St. Mary's Law School in San Antonio in 1982, where he took only the tax course St. Mary's required.

Garcia's first legal job was working at the city attorney's office in McAllen handling misdemeanors from traffic tickets to simple assaults. After three months with that office, he left to work for a personal-injury attorney in Weslaco, Texas. But after seven months there, he moved to Colorado to attend the University of Denver's tax L.L.M. program in 1984. But that too didn't stick--he quit the L.L.M. program after nine months because he was bored. He then moved back to McAllen to work for a personal-injury firm, Hendricks & Smith, and got married in November 1984.

In January 1985, Garcia opened up his own general practice. Garcia started off with divorces, DWIs, and traffic tickets and even handled a criminal tax case for a defendant who had failed to file tax returns for four years. But since 1997 Garcia's practice has been made up of personal-injury cases.

His practice has steadily grown over the years--he's even hired other attorneys and support staff. In 2000 and 2001, Garcia's wife handled the firm's books and records, and she monitored the firm's cash outlays. It was the Garcias' accountant who prepared the couple's 2000 return, and they reported more than $500,000 of income from the law practice that year.

**[\*8]**   C.   The Jackpot

Around 2000, Bridgestone/Firestone, Inc. recalled some of the tires it had built in Decatur, Illinois.  The recalled tires had a high rate of failure on Ford Explorers, and this had caused a number of wrecks and rollovers.  See City of Monroe Emps. Ret. Sys. v. Bridgestone Corp., 399 F.3d 651 (6th Cir. 2005).  Some of these accidents happened in McAllen, and all three petitioners began lining up injured clients.  Those cases resulted in all three earning big paydays in 2001: Lawrence got a fee of about $1 million, Salazar $1.5 million (with additional fees structured for payout in later years), and Garcia $2.2 million.

1.   Lawrence

Lawrence's ordinary income from his law practice that year was about $1.5 million, but he didn't make any estimated tax payments.  Instead, he bought a finance company that gave people unsecured loans of $600 or less.  He also increased his stock and bond investments and bought some property near the beach.  These investments--at least before November 2001--were somewhat conservative, with about 50-60% in fixed income investments, 20-30% in cash, and 15-20% in equities.

[*9]        2.    Salazar

Salazar had about $1.5 million in net income from his law practice in 2001. He, however, made $575,000 in estimated tax payments. He also invested most of the remainder in equity and fixed-income mutual funds.

        3.    Garcia

Garcia had over $2 million in net income from his law firm in 2001. Like Salazar, he also anticipated a big tax bill and made $533,000 in estimated tax payments. Like the other lawyers, he also put much of the Firestone windfall into some mutual funds and blue-chip stocks.

II.    Enter Mr. Garza

Joe Garza is an attorney from Dallas, Texas, who had a long-established practice in insurance defense, ERISA, and bond financing before he moved into tax planning--sometimes quite aggressive tax planning. See Garcia v. Commissioner, T.C. Memo. 2011-85, 2011 WL 1404919; Estate of Hurford v. Commissioner, T.C. Memo. 2008-278, 2008 WL 5203652; 7050, Ltd. v. Commissioner, T.C. Memo. 2008-112, 2008 WL 1819920. It was he who sold the

**[*10]** three lawyers on something none of them had heard of before--a variant of the now notorious Son-of-BOSS deal using digital options and Canadian dollars.[4]

A.     The Approach

Around 1999 to 2000, Garza first became aware of Son-of-BOSS transactions--Jenkens & Gilchrist was doing a lot of them, and several of his clients wanted to do them too.  Garza concluded that he could either refer his interested clients to Jenkens & Gilchrist, or do the deals himself.  He decided to learn how to do the deals himself.

First he consulted with Craig Brubaker--an ex-Arthur Andersen employee and at the time a director at Deutsche Bank Alex Brown.  Brubaker had been working on a lot of these deals for Jenkens & Gilchrist, and Garza was confident of Brubaker's knowledge and abilities.  Brubaker gave Garza some information on how these deals worked and how much Deutsche Bank charged for them.

Brubaker also suggested that Garza speak to another lawyer rumored to have done a $100 million transaction for a local billionaire that "went real well" to

---

[4] Garza wasn't really urging a speculative foray in foreign currency--he was promoting a type of Son-of-BOSS tax shelter (which is a variant of the Bond and Options Sales Strategy (BOSS) shelter) that uses European digital options on foreign currency.  Unlike an "American" option, which can be exercised at any time before it expires, a "European" option can be exercised only at a particular date and time.  An option is "digital" if it has the same payout no matter how far in the money it is.  Digital options are also known as "all-or-nothing" options.

[*11] learn more.  Garza followed Brubaker's recommendation, and paid the lawyer $50,000 for a dark-side CLE on the finer points of the deal.  Included in the bargain was a turnkey opinion letter--one that Garza could use in his own practice.  (The legal sections of the opinion letters he later sold to Lawrence, Salazar, and Garcia closely resemble this draft opinion letter.)  Part of Garza's promotional pitch was that if a taxpayer had a "good" tax opinion letter, he would not have to pay any penalties even if the tax benefits were disallowed.

Once Garza had his turnkey opinion letter and knew the transaction well enough, he began pitching.  The purpose of all Son-of-BOSS tax shelters is to create "artificial tax losses designed to offset income from other transactions." Napoliello v. Commissioner, 655 F.3d 1060, 1062 (9th Cir. 2011) (citation and internal quotation marks omitted).  Garza's scheme involved a partnership and having his clients transfer assets along with significant liabilities to that partnership.  As a matter of economics, the liabilities would offset the value of the assets, but those liabilities wouldn't be completely fixed at the time of transfer, and the purported partners would ignore them in calculating their outside bases in that partnership.  The partnership would also ignore the liabilities in computing its inside bases in the contributed property, which conceivably became partnership property.  Ignoring the liabilities in calculating basis creates an inflated basis.

**[*12]** When the purported partners liquidated their partnership interests, they would get a distribution of property to which they would attach this high basis in the partnership. And then when they sold that property it would produce large tax--but not out-of-pocket--losses.

Garza used a six-step deal: (1) buy a foreign-currency call option (and sell an offsetting foreign-currency call option in the same currency to the same counterparty)[5] and also Canadian dollars through a single-member LLC; (2) form a partnership with a third party or wholly owned LLC; (3) contribute the foreign-currency options and Canadian dollars to the partnership; (4) recognize a gain or loss by the partnership when the options expired or were exercised; (5) terminate and liquidate the partnership; and (6) sell the Canadian dollars that the single-member LLC received from the partnership's liquidation. Garza also testified that one considerable advantage of attaching the inflated basis to

---

[5] We refer elsewhere in this opinion to such options as "long options" and "short options." "Long" can mean several things in finance-speak; here, it simply means to buy and hold a position. "Short," likewise, has multiple meanings: here, it means to sell a position. Because the long and short legs in the option transactions involved the same parties, the same periods, and the same counterparties, they economically zeroed each other out except for the narrow spread between the two strike prices: One party could buy the yen at $X from the second party, and the second party could turn around and buy the yen at $X minus the spread from the first party.

[*13] Canadian dollars was to enable partners to store it in an account to be drawn down as needed to shelter his customers' ordinary income in later years.

Garza says he would always have his clients choose which currency to use but would make strong recommendations. He would also insist that each of his clients talk with Brubaker. Brubaker would explain what trades would be made, answer other questions, and help them set up their Deutsche Bank accounts. We also note especially that Garza never asked Brubaker how Deutsche Bank valued the options.

B.    Garza Spreads to McAllen

Bad ideas can be especially contagious in a small town. Garza had already been doing some work in the Valley on pension plans in the late '90s, and even did some work for Gonzalez on a subchapter S ESOP. That's how he was introduced to Lawrence in 1999--in a chance meeting in Gonzalez's office that involved the exchange of pleasantries.

But it wasn't until 2000 and 2001 that Garza began promoting the digital-option Son-of-BOSS deal to his contacts in McAllen. It's not surprising that Lawrence and Gonzalez listened to his pitch: They were expecting big tax bills for 2001 because of the contingency fees from their Firestone cases. (Lawrence actually got Gonzalez involved in the Firestone litigation because he couldn't

**[*14]** represent all of the people injured in a particular accident.) And Garza pitched a way he said could drastically reduce their expected income-tax bill.

Lawrence first met with Garza in 2000 to discuss the transaction and its tax benefits. Sometime after their first meeting, Lawrence approached Albert Lopez, his broker at Merrill Lynch, to see if he could execute the investment strategy Garza advertised. Lopez said it wasn't his area of expertise and wasn't the type of transaction he could do. (At some point, Garza also explained to Lawrence that he couldn't do the option trades at Merrill Lynch because the tax benefits depended on setting up the trades through a series of entities, which Merrill couldn't or wouldn't do.)

Lawrence met with Garza again in 2001. Garza explained in greater detail how the trades worked, how he was able to predict the movement of the Japanese yen against the U.S. dollar, and how he would structure the investment to secure its promised benefits. Lawrence admitted at trial that when he met with Garza in 2001, he knew there were "important tax consequences to how you did the transaction."

Garcia and Salazar also caught the Son-of-BOSS bug in 2001. Gonzalez held a meeting at his office around October or November 2001, and invited a few others. Garza did a presentation on the digital-option deal. Although we aren't

[*15] sure whether Lawrence was at this meeting, we do know Garcia was invited but didn't show. Garcia had to work late that night, so he got the recap from Gonzalez over the phone. That is how he first heard about Garza's transaction, and is what prompted him to call Garza to learn more.

Garcia then flew to Dallas to talk with Garza in person and to check out his firm. While he was there, Garza talked with him about the transaction and its tax benefits, and then took him to meet Brubaker--whose office was only a short walk away. Brubaker tried to sell Garcia on the deal, telling him that he'd done a lot of similar transactions. Garcia then returned home and called Salazar to tell him about his trip.

Garcia mentioned to Salazar that both Garza and the deal looked legit, and he was thinking about doing it. This wasn't an unusual conversation: Garcia and Salazar are close friends and had a history of investing together. By now Salazar was interested in the transaction too and met with Garza in McAllen in late November or early December 2001 to discuss the investment strategy and the related tax benefits.

We find that Garza told Lawrence, Garcia, and Salazar that the deal he was offering would give them a 30 to 40% chance of doubling their money, and a very remote chance of making a lot more than that if the spot rate landed on the sweet

[*16] spot.[6]  Garza testified at trial that he tried very hard to make his clients money on the options because he believed it would then be easier to prove a legitimate profit motive for his scheme.

We don't know whether Garza provided written materials explaining the transaction (other than the opinion letter) to Lawrence, Salazar, and Garcia.  But we do know that Garza told Lawrence, Salazar, and Garcia that if the investments were structured carefully, they could take advantage of significant tax benefits.  Although Lawrence and Garcia denied it, we also find that Garza told all three of them that the transactions had to be done before the end of 2001 to take advantage of those benefits.  Garza also specifically warned Garcia at least that it was more difficult to make a profit with the deal late in the year because there was less time for the market to "gyrate."

C.      The Deals That Were Done

Garza charged Lawrence, Garcia, and Salazar $95,000 each for his services. The bills that Garza sent to Lawrence, Garcia, and Salazar were entitled "Statement for Services Rendered," and said they covered "all services to be

---

[6] If on the expiration date, the reference price for the foreign currency options falls between the strike prices for the long and short positions, that is hitting the "sweet spot."  That is because under this scenario the investor would receive a payment under the long option without having to pay out under the short option.

**[*17]** rendered in connection with [their] digital option transaction[s] and the related legal opinion," including:

- formation of LLC disregarded entity;

- formation of limited partnership;

- negotiations with investment bank and review of transactions;

- legal opinion letter;

- tax return preparation and review.[7]

It also said that the $95,000 would cover "any and all services necessary in the event that either you or the above entities are selected for an audit by the IRS in the future." This meant that Garza would cover their legal fees if the transaction blew up.

Garza required Lawrence, Salazar, and Garcia to pay the first installment of $47,500 when they received their "Statement for Services Rendered," and the remaining $47,500 when he delivered their legal opinion. Lawrence paid the first installment in October and the second in December 2001. Garcia and Salazar both paid their first installments in December 2001, and the second only in the new year.

---

[7] Occasionally, Garza would review returns but he did not prepare them.

[*18] All three attorneys knew that the entities were created to capture the tax benefits of the digital option/Canadian dollar transaction, and all relied on Garza to prepare the paperwork and file the necessary documents with the different state authorities. Garza claimed that one reason to use the LLCs to do the investments was that Deutsche Bank said doing so would get around a Securities and Exchange Commission rule that required a 30-day waiting period for individuals who wanted to set up an option-trading account. Garza, however, admitted at trial that the real reason for creating the LLCs and then putting them into partnerships with their owners was that he thought it necessary to do so to generate the tax benefits. And he also admitted that buying Canadian dollars and disposing of them in a liquidating distribution was also for tax purposes. We specifically find these latter two admissions credible.

Garza chose to organize the entities in Colorado and Georgia because those states processed filings quickly and cheaply. He named the entities with numbers because he wanted to avoid any snags that might have slowed the deal if someone else had an LLC or partnership with the same name. And Garza didn't draft any of the entity agreements from scratch, but adapted the sample he already had. He picked Deutsche Bank to execute the trades because he liked Brubaker more than

**[*19]** the people at other banks, and he just assumed Deutsche Bank's fees and prices were fair.

### 1.      The Lawrence SoB

Garza launched the Lawrence transaction on October 19, 2001 and things took off quickly:

! From October 25 to 30, 2001, Garza helped Lawrence form three entities:  0327 LLC, 67 LLC, and 466, Ltd.

   " 0327 is a disregarded entity for federal tax purposes, was formed under Georgia law, and Lawrence is listed as its sole member.

   " 67 was formed as a Colorado limited liability company, Lawrence was its sole member, and it never made an election on Form 8832[8] to be classified as an association for federal tax purposes.

   " 466 was formed as a Colorado limited partnership, and on its 2001 return it listed Lawrence as a 99% limited partner, and 67 as a general partner with a 1% limited-partnership interest.

! In late October 2001, Lawrence set up three accounts with Deutsche Bank--one for the Lawrence Law Firm, one for 0327, and one for 466.

---

[8] A U.S. business entity with only one member is either a corporation or a disregarded entity.  If it doesn't want to be disregarded, Form 8832, Entity Classification Election, allows the entity to affirmatively elect to be taxed as a corporation.  Sec. 301.7701-3(b)(1)(ii), (c)(1)(i), Proced. & Admin. Regs.

**[\*20]** ! On October 30, 2001, $41,000 was deposited into 0327's Deutsche Bank account--this was the only capital contribution made to 0327.

! On November 1, 2001, 0327 bought and sold offsetting long and short foreign-currency options on Japanese yen from Deutsche Bank for a $40,000 net premium.[9] Both options expired on December 12, 2001.

! On or about December 3, 2001, 0327 transferred both the long and short options to 466.

! On December 4, 2001, 0327 bought Can$1,100.12 for US$750 (at an exchange rate of .68174380 US$ to Can$).

! On December 12, 2001, the options expired in the money, and Deutsche Bank paid him $80,000 on December 21, 2001.

! On or about December 24, 2001, 0327 transferred the Can$1,100.12 to 466.

! On December 26, 2001, Lawrence asked Deutsche Bank to transfer $47,500 to an account for Garza & Staples to pay his legal fees, and $5,000 to an account at another bank.

! On or about December 27, 2001, 466 transferred the Can$1,100.12 to the Deutsche Bank account for the Law Office of Larry Lawrence--but this may have been in error. However, only Can$385.04 (out of the Can$1,100.12) was transferred back to 0327's account.

---

[9] The premiums on the long and short positions were $4 million and $3,960,000, respectively.

**[*21]** !      On December 28, 2001, 0327 sold Can$385.04 (at an exchange rate of .49800029 US$ to Can$) for US$191.75, which was deposited into 0327's Deutsche Bank account.[10]

!      On December 31, 2001, a Cancellation of Domestic Certificate of Limited Partnership was filed in Colorado for 466.

There's no evidence in the record that 0327, 67, and 466 did any other deals. We find that they had no activities other than those listed above.

Before the digital-currency options would've expired, Lawrence agreed to settle them for a payment of $54,300 from Deutsche Bank. But the settlement under that agreement took too long and didn't go through in time. As we've mentioned, this meant Lawrence lucked out and Deutsche Bank paid him $80,000.

Lawrence's wife wasn't involved in the decision to buy into Garza's plan, and wasn't involved in any part of the deal. Lawrence himself was not immersed in the details. He blindly signed the paperwork as Garza gave it to him. He had no relationship to the states where the entities were located, and the address listed in the paperwork Garza sent to the Colorado secretary of state for him was the same address Salazar and Garcia used. It was not his own. Lawrence made no effort to determine if the $40,000 premium he paid for the options was a fair

---

[10] The remaining Canadian dollars were apparently sold in 2002.

[*22] price.[11]  Before November 2001, Lawrence had never invested in foreign currency other than trading U.S. dollars against the Mexican peso back when he was a busboy and waiter.

### 2. The Salazar SoB

Garza launched the Salazar transaction on December 17, 2001, and it also quickly took flight:

- ! On December 17, 2001, Garza helped Salazar form three entities: 0997 LLC, 70 LLC, and 541, Ltd.

  - " 0997 is a disregarded entity for federal tax purposes, it was formed under Georgia law, and Salazar is listed as its sole member.

  - " 70 was formed as a Colorado limited liability company, Salazar was its sole member, and it never made an election on Form 8832 to be classified as an association for federal tax purposes.

  - " 541 was formed as a Colorado limited partnership, and on its 2001 return it listed Salazar as a 99% limited partner, and 70 as a general partner with a 1% limited-partnership interest.

- ! In mid-December 2001, Salazar opened accounts with Deutsche Bank for 0997 and 541.

---

[11] We talk about the value of the options later, but note here that the Commissioner's experts reasonably estimated the options to be worth about $25,500 using the Black-Scholes formula for pricing options.  Had Lawrence looked into the premium, he might've noticed Deutsche Bank was charging him over a 50% markup.

[*23] ! 0997 bought and sold offsetting long and short Japanese yen options from Deutsche Bank for a $40,000 net premium.[12] The paperwork is dated December 14, but the account wasn't funded until December 19. Both options expired on December 21, 2001. Either on December 21-- or one day earlier--0997 transferred both the long and short options to 541.

! On December 19, 2001, $45,000 was deposited into 0997's Deutsche Bank account–this was the only capital contribution made to 0997.

! On December 21, 2001, the options expired out of the money.

! On December 24, 2001, 0997 bought Can$7,027.44 for US$4,500 (at an exchange rate of .64034700 US$ to Can$).

! On December 28, 2001, 0997 sold Can$2,459.60 (at an exchange rate of .60753370 US$ to Can$) for US$1,494.29, which was deposited in 0997's Deutsche Bank account.[13]

! On December 31, 2001, a Cancellation of Domestic Certificate of Limited Partnership was filed in Colorado for 541.

There's no evidence in the record that 0997, 70, and 541 did any other deals, or had any activity other than what we've listed.

Salazar's wife wasn't involved in the transaction in any way, and she wasn't part of the decision to do it. Salazar wasn't knee-deep in the details of the transaction himself: He blindly signed the paperwork as Garza gave it to him.

---

[12] The premiums on the long and short positions were $4 million and $3,960,000, respectively.

[13] It appears that the remaining Canadian dollars were sold in 2002.

**[\*24]** Like Lawrence, Salazar also had no relationship to the states where the entities were located, and he also reported the same address to the Colorado secretary of state as his friends. Like Lawrence, he made no effort to determine if the $40,000 premium he paid for the options was a fair price. And before December 2001, Salazar had never invested in foreign currency even casually in his youth.

        3.     <u>The Garcia SoB</u>

Garza did much the same for Garcia:

!      On December 14, 2001, Garza helped Garcia form three entities: 464 LLC, 96 LLC, and 6611, Ltd.

    "      464 is a disregarded entity for federal tax purposes, was formed under Georgia law, and listed Garcia as its sole member.

    "      96 was formed as a Colorado limited liability company, Garcia was its sole member, and it never made an election on Form 8832 to be classified as an association for federal tax purposes.

    "      6611 was formed as a Colorado limited partnership, and on its 2001 return it listed Garcia as a 99% limited partner, and 96 as a general partner with a 1% limited-partnership interest.

!      In mid-December 2001, Garcia set up accounts with Deutsche Bank for 464 and 6611.

!      On December 14, 2001, 464 bought and sold offsetting long and short options on Japanese yen from Deutsche Bank for a $50,000 net

**[*25]**    premium.[14]  Both options expired on December 21, 2001.  That same day--or maybe a week before or maybe five days later (the paperwork is murky)--464 transferred both the long and short options to 6611.

! On December 14, 2001, $55,000 was deposited into 464's Deutsche Bank account--this was the only capital contribution made to 464.

! On December 19, 2001, 464 bought Can$7,004.30 for US$4,500 (at an exchange rate of .64246200 US$ to Can$).

! On December 21, 2001, the options expired out of the money, with zero payout due to either party.

! On December 31, 2001, 464 sold Can$2,451.50 (at an exchange rate of .60746890 US/Can) for US$1,489.21, which was deposited in 464's Deutsche Bank account.[15]

! On December 31, 2001, a Cancellation of Domestic Certificate of Limited Partnership was filed in Colorado for 6611.

There's no evidence in the record that 464, 96, and 6611 did any other deals or had any activity other than what we've listed.

Garcia's wife was as uninvolved as Lawrence's and Salazar's in the transaction.  And, like his friends, Garcia blindly executed all the documents Garza gave him to sign.  He knew that buying the currency options and transferring them between 464 and 6611 was part of the plan he asked Garza to

---

[14] The premiums on the long and short positions were $5,000,000 and $4,950,000, respectively.

[15] It appears that the remaining Canadian dollars were sold in 2002.

[*26] carry out. He also knew that the only reason for buying and selling Canadian dollars was that it was "part of the investment" and would serve as a triggering event for the tax benefits. "Other than buying a Krugerrand during a vacation in South Africa," Garcia had also never invested in foreign currency before.

III.    Reporting the Transactions

A.    Garza's Opinion

Garza provided opinion letters to Lawrence, Salazar, and Garcia dated December 30, 2001. Each letter had about four pages of facts supposedly describing the transaction and over 80 pages of boilerplate on tax-law doctrines-- running the gamut from partnership-basis rules, treatment of foreign-currency contracts, the step-transaction doctrine, economic substance, disguised-sale provisions, and partnership anti-abuse regulations. The letters also concluded that the tax treatment Garza proposed would "more likely than not" withstand IRS scrutiny.

Garza, however, relied on certain "facts" to reach his "more likely than not" conclusion, and these "facts" were just plain wrong. Here are some of the key mistakes he made in the factual recitation section--the first four pages of each opinion:

**[*27]** • The opinion letters say that the Lawrence, Salazar, and Garcia made the factual representations it recited.

- • Lawrence, Salazar, and Garcia made no factual representations with respect to the transactions. Garza stated them on his own.

• The opinion letters say that Lawrence, Salazar, and Garcia "believed there was [a] reasonable opportunity to earn a reasonable pre-tax profit from the transactions * * * (not including any tax benefits that may occur), in excess of all the associated fees and costs."

- • Garza's $95,000 fee was ignored in reaching that conclusion. The opinions don't mention Garza's fee at all.

And here are some of the key factual mistakes made in the opinion letters'

discussion section, on which Garcia based key legal conclusions:

- • The purchased (long) and sold (short) options had their own confirmations.

- • The long and short options were the subject of the same confirmation.

- • The partnership had to deliver foreign currency if the short option was exercised.

- • The partnership had no obligation to deliver foreign currency.

- • As of the date of the opinion, the options have not yet expired--so it's uncertain whether the partnership will have to satisfy its obligation regarding the short option.

- • The options had already expired when Garza sent out the opinion letters, and the obligations under the option contracts were by that time certain.

**[*28]** • None of the partnerships' (*i.e.*, 466, 541, and 6611) partners were related.

  • The partners of each partnership were related--Lawrence, Salazar, and Garcia were the 99% limited partners, and each man's wholly owned and controlled LLC was the 1% general partner.

  • The assets contributed by a partner (Lawrence, Salazar, and Garcia) would not be the same assets distributed to that partner.

  • The Canadian dollars distributed were the same ones contributed by the partner.

Garza admitted at trial that most of his clients got opinion letters because, in the event the transaction wasn't respected by the government, taxpayers could avoid penalties with a good one. These letters do not mention, however, Notice 2000-44, Tax Avoidance Using Artificially High Basis, 2000-2 C.B. 255, published on September 5, 2000.

B. <u>Return Preparers</u>

Ken Everhard prepared the 2001 partnership and joint returns for Garcia and Salazar. But for Lawrence he prepared only 466's 2001 Form 1065, U.S. Return of Partnership Income. (Drefke prepared the Lawrences' 2001 joint federal income tax return and Form 1120S.)

**[*29]**     1.    <u>Ken Everhard</u>

Ken Everhard is a certified public accountant who has practiced in McAllen since the 1960s, and has a good reputation. Part of Everhard's practice includes the preparation of both simple and complicated partnership tax returns. But Everhard has not written tax opinions.

Everhard first learned of the digital option/Canadian dollar transaction from Garcia. In late 2000 Garcia's CPA, Ann Howe, told him to find a new accountant because she was leaving her practice to go work with her father. Everhard was the obvious replacement: Garcia's family had been friends with Everhard for decades and they highly recommended him. In late November or early December 2001, Garcia told Everhard that he "heard about Joe Garza and a plan that he had," and asked for Everhard's thoughts. Everhard then called Garza and arranged a trip to Dallas to meet him. Garza gave Everhard a draft opinion letter discussing the transaction (with no names on it) when he arrived. On a second trip to Dallas, for another client, Everhard met a second time with both Garza and Brubaker.

At the recommendation of Garcia, Salazar hired Everhard in 2001. Like Garcia, Salazar also talked to Everhard about the transaction in December of that year. But Lawrence didn't hire Everhard until March or April 2002, and even then only at the recommendation of Garza.

**[\*30]** It is important for us to be precise in finding just what Everhard did in addition to preparing the lawyers' returns.  We find that Everhard did investigate the deal in some way--he read Garza's opinion letters carefully, and he checked some of the cases and rulings that it cited--at least the ones he thought were important.  But we find that Everhard did not do any other research--he couldn't recall reading any cases or guidance that weren't cited in the opinion letter.  We also find that he was honest with Lawrence, Salazar, and Garcia about that:  He told them that he read some of the cases cited in Garza's opinion letter but never suggested that he did anything more.

We do believe Everhard told Lawrence, Salazar, and Garcia that the transaction was aggressive but that he saw some support for it.  But we also find that he told them that he was not giving them a tax opinion as to whether the perceived tax benefits would stand up--they would have to rely on Garza for that. We find that Everhard didn't verify any of the factual assertions made in the opinion letters--either independently or by questioning Lawrence, Salazar, or Garcia--even though he did get some of the relevant documents.  He just assumed the transaction was executed as described in the opinion letters.  And it was Everhard's practice to tell all of his clients that it's their job to make sure that they have all the right documents.  He just uses the numbers that he's given.

[*31] We therefore find that Everhard handled only the reporting and preparation of Lawrence, Salazar, and Garcia's returns. He charged them only for return preparation, not his advice. We do also find that he was not in cahoots with Garza. Garza did pay him to prepare Lawrence's partnership's return, but Everhard didn't get any compensation from Garza other than this small return-preparation fee--only about $2,200.

### 2. David Drefke

David Drefke is another CPA in McAllen, and he prepared the Lawrences' joint return and Form 1120S for Lawrence's law practice for 2001. While Drefke copied the information from 466's Schedules K-1, Partner's Share of Income, Deductions, Credits, etc.; and Form 4797, Sales of Business Property, prepared by Everhard to the Lawrences' return, that was the extent of his work on the transaction. Drefke reported the losses and deductions arising from the deal (including the characterization and deductibility of Garza's fees as a referral-fee deduction), as Lawrence instructed and as Everhard had mapped out.

Drefke lacked the necessary background knowledge to analyze the tax consequences of the deal. Lawrence did not ask Drefke to check out the validity of its tax benefits, and Drefke didn't do it on his own. He was never given any of

**[*32]** the relevant transactional documents, and he's never represented himself to be an expert in the taxation of foreign-currency-option transactions.

### C. What Was Reported

#### 1. Lawrence

On its Form 4797, 466 reported a $14,300 ordinary gain from a "yen currency option (section 988)." The acquisition date of the foreign-currency-option was reported as November 1, 2001, and the disposition date was reported as December 10, 2001. 466 listed its basis in the option as $40,000 and its gross sale price as $54,300. But this wasn't correct: The amount realized was $80,000, see supra pp. 20-21, because Deutsche Bank paid $80,000 when both the long and short options expired in the money. 466 allocated $14,157 of the $14,300 reported gain to Lawrence and the rest--$143--to 67 on the Schedules K-1.

On its partnership return for that year, 466 reported partner capital contributions of $4,040,750--the $4 million long option notional premium; the $40,000 net premium on the option spread; and the $750 in Canadian dollars. (Reporting both the $4 million long option notional premium and the $40,000 net premium on its return is double counting.) While 466 treated the $4 million long option notional premium as a capital contribution, it did not report the liability inherent in the $3,960,000 short option notional premium. 466 allocated

**[*33]** $4,000,342 of the capital contributions to Lawrence and $40,408 to 67 on the Schedules K-1.

On its partnership return 466 also reported distributions of money (cash and marketable securities) of $54,300, allocating $53,757 of the reported distributions to Lawrence and $543 to 67. It reported distributions of property other than money of $4,000,750, which resulted from treating the $4 million long option premium notional amount as a contribution that would be distributed upon the liquidation of 466. It did not, however, take into consideration the liability inherent in the $3,960,000 short option premium. 466 allocated $3,960,742 of the noncash distributions to Lawrence and $40,008 to 67 on the Schedules K-1.

But remember that by this time the options had long since expired, so the supposed basis in the long option can theoretically be attached to the only noncash (i.e., non-American cash) asset 466 had left--the Can$1,100.12. By reporting this $4,000,750 as a "distribution of property," Everhard was effectively reporting it as 466's basis in that property. Although we make only partnership-level determinations here, we do note that Lawrence doesn't seem to have used all of that basis in 2001 because he didn't sell all of the Canadian dollars that year. Lawrence does seem to have sold Can$385.04 in 2001, and then claimed a loss of $1,400,063. This claimed loss was conveniently close to the $1.5 million that

**[\*34]** Lawrence's law practice netted in 2001, and left the Lawrences with only $85,544 in taxable income.

Lawrence even deducted Garza's $95,000 fee as a "referral fee" paid by the Lawrence Law Firm.

### 2. Salazar

541's 2001 partnership return reported a $40,000 ordinary loss on Form 4797, and identified the reported loss as from a "yen currency option (section 988)." 541 reported it had acquired the option on December 14, 2001, and disposed of it on December 21, 2001. 541 reported its basis in the option was $40,000.[16] Of the reported $40,000 loss, 541 allocated $39,600 to Salazar and $400 to 70 on the Schedules K-1.

The partnership return reported partner capital contributions of $4,044,500-- the $4 million long option notional premium; the $40,000 net premium on the option spread; and the $4,500 in Canadian dollars. (Reporting both the $4 million long option notional premium and the $40,000 net premium is double counting.) The partnership return treated the $4 million long option notional premium as a

---

[16] Salazar and 541 reported their bases inconsistently. Salazar claimed a high outside basis, while 541 claimed only a small loss when the options expired out of the money.

[*35] capital contribution, but did not report the liability inherent in the $3,960,000 short option notional premium.

541 reported distributions of property other than money of $4,004,500, which resulted from treating the $4 million long option premium notional amount as a contribution whose basis would attach to any noncash property distributed upon the liquidation of 541. This reporting did not, however, take into consideration the liability inherent in the $3,960,000 short option premium. 541 allocated $3,964,455 to Salazar and $40,045 to 70 on the Schedules K-1. By reporting this $4,004,500 as a "distribution of property," Everhard was effectively reporting it as 541's basis in that property--the Can$7,027.44 Canadian dollars distributed. We note that when Salazar sold 2,459.60 of those Canadian dollars in 2001, he claimed a loss of $1,400,081. Like Lawrence, this claimed loss was conveniently close to the $1.5 million net profit from Salazar's law practice in 2001, and left the Salazars with only $64,892 in taxable income.

For the Salazar Law Office part of the Salazars' joint return, Everhard claimed, at Salazar's request, a deduction of $47,500 in fees for "legal and professional services." Everhard did not know at that time that the $47,500 was part of Garza's fee.

**[*36]**        3.    <u>Garcia</u>

6611's partnership return reported a $50,000 ordinary loss on Form 4797,

and identified the reported loss as from a "yen currency option (section 988)."[17]

6611 reported that it acquired the foreign-currency option on December 17, 2001,

and disposed of it on December 21, 2001.  6611 reported its basis in the option as

$50,000, and allocated $49,500 of the loss to Garcia and $500 to 96 on the

Schedules K-1.

The partnership return reported partner capital contributions of $5,054,500--

the $5,000,000 long option notional premium; the $50,000 net premium on the

option spread; and the $4,500 in Canadian dollars.  (Reporting both the $5,000,000

long option notional premium and the $50,000 net premium is double counting.)  It

reported the $5,000,000 long option notional premium as a capital contribution, but

did not report the liability inherent in the $4,950,000 short option notional premium.

On its partnership return 6611 also reported $5,004,500 in distributions of

property other than money, and allocated $4,954,455 of the distributions to Garcia

---

[17] Like 541, 6611 was inconsistent in reporting its bases--claiming only a small loss when the options expired implicitly recognizes the effect of the offsetting options on basis--reporting a massive basis in the distributed Canadian dollars does not.  (The same might be said of 466 and its reporting of only a small gain at the partnership level.)

**[*37]** and $50,045 to 96 on the Schedules K-1. This was again a result of treating the long option premium notional amount as a contribution that would later be distributed when 6611 was liquidated, but not taking into account the offsetting liability inherent in the $4,950,000 short option premium. But this is the way basis-inflation shelters work, so 6611's reporting this $5,004,500 as a distribution of property other than money was effectively reporting it as 6611's basis in the Can$7,004.30 distributed. We note that Garcia sold only Can$2,451.50 in 2001, but the sale had its desired effect, and he claimed a loss of $1,750,086--enough to offset most of his $2.26 million net profit from his law practice--while letting him store the rest of the basis-inflated Canadian dollars for future use.

The Garcias also reported losses totaling $49,500 that passed through from 6611's partnership return to their joint return. On the Schedule C for the Garcia Law Office under "Legal and Professional Services," Everhard included, at Garcia's request, a $47,500 deduction for what the law office's general ledger described as "Accounting Fees." What Everhard did not know at the time was that the $47,500 was for only the first half of Garza's $95,000 fee for the deal.

[*38] IV.    Prelude

The Commissioner issued notices of final partnership administrative

adjustment (FPAAs) to 466, 541, and 6611 in April 2005.  The FPAAs adjusted

various items to zero and determined accuracy-related penalties under section

6662.[18]

The FPAA sent to 466 made the following adjustments:

| Partnership item | As reported | As adjusted |
|---|---|---|
| Ordinary income  (loss)  (Form 4797, line 18) | $14,300 | -0- |
| Capital contributions  (Sched. M-2, line 2) | 4,040,750 | -0- |
| Distributions of property  other than money  (Sched. K, line 23) | 4,000,750 | -0- |
| Distributions of cash and  marketable securities | 54,300 | -0- |

[18] An FPAA generally includes:  (1) a Notice of Final Partnership
Administrative Adjustment, (2) Form 870-PT, Agreement for Partnership Items and
Partnership Level Determinations as to Penalties, Additions to Tax, and Additional
Amounts, including a Schedule of Adjustments, and (3) an "Exhibit A-Explanation
of Items," listing the Commissioner's other adjustments or determinations.

[*39] The FPAA sent to 541:

| Partnership item | As reported | As adjusted |
|---|---|---|
| Ordinary income (loss) (Form 4797, line 18) | ($40,000) | -0- |
| Capital contributions (Sched. M-2, line 2) | 4,044,550 | -0- |
| Distributions of property other than money (Sched. K, line 23) | 4,004,500 | -0- |

And the FPAA to 6611:

| Partnership item | As reported | As adjusted |
|---|---|---|
| Ordinary income (loss) (Form 4797, line 18) | ($50,000) | -0- |
| Capital contributions (Sched. M-2, line 2) | 5,054,500 | -0- |
| Distributions of property other than money (Sched. K, line 23) | 5,004,500 | -0- |

In each case, the FPAA Schedule of Adjustments did not *adjust* the

partners' outside bases. But in each FPAA "Exhibit A-Explanation of Items" sent

[*40] to 466, 541, and 6611, the Commissioner did make *determinations* about outside basis, including the determination that "the partners * * * have not established adjusted bases in their respective partnership interests in an amount greater than zero (-0-)." (The Commissioner seems to have copied 6611's Exhibit A-Explanation of Items from 466's, but forgot to change all the "466"s to "6611"s. We'll treat it as a typo that no one was confused by.) This may or may not have been sufficient to put outside basis at issue here, cf. Clovis I v. Commissioner, 88 T.C. 980, 982 (1987), but the Commissioner later conceded that the FPAA did not adjust outside basis and that outside basis wasn't being challenged "at the partnership level." Unlike a concession on a point of law regarding whether we have jurisdiction over outside basis at the partnership level, see Tigers Eye Trading LLC v. Commissioner, 138 T.C. 67, 74 (2012), the Commissioner's concession here simply notes that these particular FPAAs were not adjusting outside basis and that he wasn't seeking a determination of outside basis in this partnership-level proceeding.

We have previously held that parties, including the Commissioner, may concede adjustments noted in the FPAA before we enter a decision. See, e.g., Von-Lusk v. Commissioner, 104 T.C. 207, 208 (1995) (conceding FPAA adjustment in amended answer); Rovakat, LLC v. Commissioner, T.C. Memo.

**[*41]** 2011-225, 2011 WL 4374589 at *23 n.22 (conceding on brief by failing to defend FPAA adjustment). While we are always required to satisfy ourselves that jurisdiction exists before entering a decision, see Gray v. Commissioner, 138 T.C. 295, 297 (2012), we don't have to reach out and put into play issues the parties don't seek to adjudicate. In Tigers Eye Trading, we had to determine whether we had jurisdiction because the petitioners argued we lacked it. But we agree with the Commissioner that outside basis isn't at issue here.

What is at issue are the partnerships' inside bases. Inside basis is the basis a partnership has in its own assets, sec. 723; outside basis is the basis a partner has in his partnership interest, sec. 722; sec. 1.722-1, Example (1), Income Tax Regs. If the inflated basis in a Son-of-BOSS deal is attached to a partner's interest in a supposed partnership and a loss is realized when he disposes of that partnership interest through sale or the partnership's liquidation, it is called an outside-basis SoB. If the inflated basis is attached to an asset that the partnership holds and a loss is realized when the partner receives the asset in a distribution and then sells it, it is called an inside-basis SoB.[19]

---

[19] The usual rule is that an asset distributed by a partnership to one of its partners has a basis equal to the partnership's basis *in that very asset.* Sec. 732(a). Inside-basis SoB deals claim to be able to transfer basis within the partnership from one asset to another via section 732(b). See 7050, Ltd., 2008 WL 1819920, at *4.

(continued...)

**[\*42]** These cases all involve inside-basis SoB deals. As in other Garza-inspired transactions, <u>see, e.g.,</u> <u>106 Ltd. v. Commissioner</u>, 136 T.C. 67, 73 (2011), <u>aff'd</u>, 684 F.3d 84 (D.C. Cir. 2012); <u>7050, Ltd. v. Commissioner</u>, 2008 WL 1819920, at \*4-\*5, the inflated basis lay in foreign currency (in these cases, Canadian dollars) and the partners' goal was to have those dollars distributed to them and have as a store of tax loss that they could use when needed. One distinction between inside-basis and outside-basis SoB deals is that there is a conflict among courts about whether outside basis is a partnership item. <u>See</u> <u>Petaluma FX Partners, LLC v. Commissioner</u>, 591 F.3d 649 (D.C. Cir. 2010), <u>aff'g in part, rev'g in part, vacating and remanding on penalty issues</u> 131 T.C. 84 (2008); <u>Tigers Eye Trading</u>, 138 T.C. at 115-28. The Commissioner usually wants a penalty in both types of cases, so whether an item is a "partnership item" then affects whether a penalty "relates to an adjustment to a partnership item." <u>See</u> <u>Tigers Eye Trading</u>, 138 T.C. at 139-42.

---

[19](...continued)
Section 732(b) requires that the distribution be in liquidation of the partner's interest in the partnership--not an issue here given the dissolution of the three partnerships at the end of 2001. It does also require the partnership to know the basis of each of its assets in the hands of the partner who contributed them--which is also part of figuring out that partner's outside basis. But the parties here agree that the claimed tax benefits come from the disposition of an asset formerly held by a putative partnership, not the disposition of a partner's interest in that partnership.

**[\*43]** We happily avoid those disputes in these cases. The Commissioner does want penalties in these cases, and the FPAA Explanations of Items determined that

> [A]ll of the underpayments of tax resulting from [the] *adjustments of partnership items* are attributable to, at a minimum, (1) substantial understatements of income tax, (2) gross valuation misstatement(s), or (3) negligence or disregarded rules or regulations. * * * It is therefore determined that, at a minimum, the accuracy-related penalty under Section 6662(a) of the Internal Revenue Code applies to all underpayments of tax attributable to *adjustments of partnership items* of [the partnership]. [Emphasis added.]

The Explanations of Items went on to determine a 40% gross-valuation-misstatement penalty, or barring that, a 20% substantial-valuation-misstatement penalty. In the alternative, it asserted either a 20% penalty for negligence, disregard of rules and regulations, or substantial understatement of income tax. 466, 541, and 6611 raise in response only the defense that they each had reasonable cause and acted in good faith.[20] The Commissioner reiterated that he didn't seek penalties related to the three lawyers' outside bases in their partnerships; he seeks them related to the inflated contributions to, and distributions from, the partnerships--a partnership's basis in an asset is usually its basis in the hands of the

---

[20] They could have, but have not, argued that the imposition of penalties was somehow otherwise defective. While we must satisfy ourselves about our own jurisdiction, we deem any other counterargument regarding the imposition of penalties--apart from reasonable cause and good faith--waived by all three petitioners.

[*44] partner who's contributing that asset, sec. 723, and the basis of an asset other than money (and that means American money) distributed to a partner is usually the partnership's basis in that asset, see sec. 732(a).

There were plenty of other issues, and the three lawyers, in their roles as tax matters partners for 466, 541, and 6611, filed timely petitions. We tried the cases together in Dallas, Texas.[21]

OPINION

I.      Jurisdiction

Partnerships do not pay income tax. See sec. 701. But they do file information returns, and partners are supposed to use the numbers from those returns on their own individual returns. See secs. 6031, 6222(a). TEFRA is a set of special tax and audit rules that apply to all partnerships (with exceptions that aren't relevant here). See sec. 6231(a)(1). The goal of TEFRA is to have a single point of adjustment for all partnership items at the partnership level. See Kligfeld Holdings v. Commissioner, 128 T.C. 192, 200 (2007). TEFRA, however, limits our jurisdiction at the partnership level to

---

[21] 466, 541, and 6611 were all defunct TEFRA partnerships when the petitions were filed, so any appeal would likely head to the D.C. Circuit. See sec. 7482(b)(1).

[*45] *partnership items of the partnership for the partnership taxable year to which the notice of final partnership administrative adjustment relates*, the proper allocation of such items among the partners, and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item.

Sec. 6226(f) (emphasis added).

So what are partnership items? Section 6231(a)(3) says that

[t]he term "partnership item" means, *with respect to a partnership*, any item *required to be taken into account for the partnership's taxable year* under any provision of subtitle A to the extent regulations prescribed by the Secretary provide that, for purposes of this subtitle, such item is more appropriately determined at the partnership level than at the partner level. [Emphasis added.]

The Secretary has told us what he's determined to be partnership items in section 301.6231(a)(3)-1, Proced. & Admin. Regs. Courts still disagree over what is a "partnership item"--a very big problem given TEFRA's structural framework, which makes the distinction between partnership and nonpartnership items important to our jurisdiction.

But once we hold an item is a partnership item we have jurisdiction to determine that partnership item regardless of whether the Commissioner adjusted it in the FPAA. See, e.g., Tigers Eye Trading, 138 T.C. at 95. We also have jurisdiction to determine "the proper allocation of [these] * * * items among the partners and the applicability of any penalty, addition to tax, or additional amount

**[\*46]** that relates to an adjustment to a partnership item." Id. This latter jurisdiction isn't unlimited, however, and we have recently gone to great pains to determine its boundaries. See, e.g., id. at 95-143; Petaluma FX Partners, LLC v. Commissioner, T.C. Memo. 2012-142, 2012 WL 1758712.

A "nonpartnership item" is "an item which is (or is treated as) not a partnership item." Sec. 6231(a)(4). And an "affected item" is a nonpartnership item that is affected by the determination of a partnership item. See sec. 6231(a)(5); Ginsburg v. Commissioner, 127 T.C. 75, 79 (2006). Like other nonpartnership items, the Code tells us that we can determine affected items (with the exception of certain penalties) only at the individual level and not in a partnership-level proceeding. Because these cases are appealable to the D.C. Circuit, we must follow that court's precedent. See, e.g., Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).

**[\*47]** II.    Partnership-Item Determinations and Adjustments[22]

      A.    Validity of the Partnerships

           1.    Unchecked Boxes

The Commissioner says that 466, 541, and 6611 should all be disregarded because they failed to satisfy the regulatory requirements to be treated as partnerships. Under the check-the-box regulations, an entity with only one owner is disregarded for tax purposes (*i.e.*, treated as a "tax nothing") unless it elects to be taxed as a corporation. See sec. 301.7701-3(b), Proced. & Admin. Regs. If the single owner is an individual, the regulation tells the Commissioner to treat the entity as a sole proprietorship. See sec. 301.7701-2(a), Proced. & Admin. Regs.; see also Pierre v. Commissioner, 133 T.C. 24, 42-43 (2009) ("A sole proprietorship is generally understood to have no legal identity apart from the proprietor"). An entity with only one owner is thus ineligible for tax treatment as a partnership.

But the 2001 partnership returns for 466, 541, and 6611 seemingly list more than one owner:

---

[22] We are deciding these cases on the preponderance of the evidence, so we do not have to decide which party has the burden of proof. See, e.g., Estate of Turner v. Commissioner, 138 T.C. 306, 309 (2012).

**[*48]** •  Lawrence is the 99% limited partner, and 67 is the 1% general partner of 466;

•  Salazar is the 99% limited partner, and 70 is the 1% general partner of 541; and

•  Garcia is the 99% limited partner, and 96 is the 1% general partner of 6611.

The Commissioner says this doesn't matter and argues that because 67, 70, and 96 did not properly elect to be treated as corporations, they are disregarded entities.  See sec. 301.7701-3(b)(1)(ii), Proced. & Admin. Regs.  Since the parties stipulated that 67, 70, and 96 never elected to be classified as corporations on Forms 8832, we agree.[23]  That means that Lawrence, as the sole member of 67, will be treated as owning all of 466; Salazar, as the sole member of 70, will be treated as owning all of 541; and Garcia, as the sole member of 96, will be treated as owning all of 6611.  And we disregard a single-owner entity for tax purposes under sections 301.7701-2(a) and 301.7701-3(b)(1)(ii), Proced. & Admin. Regs., unless it elects to be taxed as a corporation.

---

[23] While individuals and entities may apply for an employer identification number (EIN) using Form SS-4, Application for Employer Identification Number, this form alone doesn't make a valid election to be taxed as a specific type of entity. For partnerships, only Form 8832 may be used to make an election.  See sec. 301.7701-3(c)(1), Proced. & Admin. Regs.; see also Form SS-4, at 3 (Rev. Apr. 2000) ("Caution:  This is not an election for a tax classification of an entity").

[*49] Each petitioner, however, has a fallback argument.  All three are married. And all three argue that because Texas is a community-property state, Lawrence's wife is the second owner of 67 and 466, Salazar's wife is the second owner of 70 and 541, and Garcia's wife is the second owner of 96 and 6611.  And, although the regulation's default rule for entities owned by an individual is to treat them as sole proprietorships, its default rule for entities owned by more than one individual is to treat them as partnerships.  See sec. 301.7701-3(a), (b)(1)(i), Proced. & Admin. Regs.

Federal law controls the classification of "partners" and "partnerships" for federal tax purposes.  See sec. 301.7701-1(a), Proced. & Admin. Regs.; see also Commissioner v. Tower, 327 U.S. 280, 288, 290 (1946).  Things that State law may regard as separate entities might not be separate entities under Federal tax law.  See sec. 301.7701-1(a)(3), Proced. & Admin. Regs.  It all depends on the Code.  Mere coownership is not enough to create a separate entity, see sec. 301.7701-1(a)(2), Proced. & Admin. Regs., and even electing to be taxed as a partnership under the check-the-box-regulations is not always enough, see sec. 301.7701-3(c), Proced. & Admin. Regs.

Though Lawrence, Garcia, and Salazar do not cite it, there is a relevant revenue procedure explaining the Commissioner's view about the intersection of

[*50] community-property law and the check-the-box regulations.[24]  Revenue

Procedure 2002-69, 2002-2 C.B. 831, provides that for a "qualified entity" that is

"owned solely by husband and wife as community property" the IRS "will respect a

taxpayer's treatment of these entities as either disregarded entities or partnerships."

But to qualify, a husband and wife must "wholly own[] * * * as community

property" a "business entity"[25] not "treated as a corporation under [section]

301.7701-2," and must uniformly treat such entity "as a partnership for federal tax

purposes"--including filing "the appropriate partnership returns."  Rev. Proc. 2002-

69, secs. 3.02, 4.02, 2002-2 C.B. at 831.

This last requirement knocks 67, 70, and 96 out of partnership contention

under the revenue procedure:  Both sides acknowledge that these three never filed

any tax return of any kind.  Since 67, 70, and 96 remain disregarded entities

notwithstanding the revenue procedure and since no one has suggested any other

way to make them partnerships under the Code, they cannot be the second

---

[24] We are not bound by revenue procedures, see Compaq Computer Corp. v. Commissioner, 113 T.C. 363, 372 (1999), but they are official statements of the Commissioner's position and we may let them persuade us, see Nationalist Movement v. Commissioner, 102 T.C. 558, 583 (1994), aff'd, 37 F.3d 216 (5th Cir. 1994).  Without deciding the validity of Revenue Procedure 2002-69, 2002-2 C.B. 831, we note that the Commissioner is the only party who argues it forecloses 67, 70, 96, 466, 541, and 6611 from being partnerships for federal tax purposes.

[25] As defined by section 301.7701-2(a), Proced. & Admin. Regs.

**[*51]** members of 466, 541, and 6611, respectively. 466, 541, and 6611 can likewise only be "partnerships" for income tax purposes if Revenue Procedure 2002-69 operates to make Lawrence's, Garcia's, and Salazar's respective wives the second member of each of those entities. For this to occur each couple must first be deemed to have formed a "business entity" under the Code.

Section 301.7701-2(a), Proced. & Admin. Regs., establishes that a business entity is:

> [A]ny *entity recognized for federal tax purposes* (including an entity with a single owner that may be disregarded as an entity separate from its owner under [section] 301.7701-3) that is not properly classified as a trust under [section] 301.7701-4 or otherwise subject to special treatment under the Internal Revenue Code. [Emphasis added.]

As a threshold matter, Lawrence, Garcia, and Salazar must therefore establish that they formed "entities" in 466, 541, and 6611 with their wives. Cf. Superior Trading, 137 T.C. at 81-82 (noting that two-company venture never constituted a taxable partnership entity because neither party "'join[ed] together as partners in the conduct of a business'"). Coownership by itself is not enough. See sec. 301.7701-1(a)(2), Proced. & Admin. Regs. (*e.g.*, sole owner or tenants-in-common of farm property rent that property to another individual for money or a share of crops). Instead we look to several factors:

- the agreement of the parties and their conduct in executing its terms;

**[*52]** • the contributions, if any, which each party has made to the venture;

• the parties' control over income and capital and the right of each to make withdrawals;

• whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income;

• whether business was conducted in the joint names of the parties;

• whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers;

• whether separate books of account were maintained for the venture; and

• whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise.

Luna v. Commissioner, 42 T.C. 1067, 1077-78 (1964). The "essential question is whether the parties intended to, and did in fact, join together for the present conduct of an undertaking or enterprise." Id. at 1077 (citing Commissioner v. Culbertson, 337 U.S. 733, 742 (1949)); see also Historic Boardwalk Hall, LLC v. Commissioner, 694 F.3d 425, 449 (3d Cir. 2012), rev'g and remanding 136 T.C. 1 (2011); Commissioner v. Tower, 327 U.S. at 286-87; Southgate Master Fund, L.L.C. ex. rel. Montgomery Capital Advisors v. United States, 659 F.3d 466, 488

**[\*53]** (5th Cir. 2011); <u>TIFD III-E, Inc. v. United States</u>, 459 F.3d 220, 231 (2d Cir. 2006) (accepting the district court's sham-transaction determination but reversing and remanding so that the district court would analyze the arrangement under the totality of the circumstances and determine whether a *bona fide* partnership existed).[26] We will examine these factors for each of the purported partnerships at issue.

### a. 466

With regard to 466, most of the <u>Luna</u> factors require little discussion.

<u>Parties' Agreement</u>. Lawrence and his wife had no side agreement regarding 466, and Mrs. Lawrence did not sign and was not explicitly a party to 466's partnership agreement. This factor weighs against finding 466 was a partnership.[27]

<u>Parties' Contribution to the Venture</u>. Mrs. Lawrence had no knowledge of 466 until sometime well after its dissolution, and did not contribute any labor or

---

[26] This entity-focused and intent-seeking approach to determining the existence of a partnership applies broadly--not just to partnerships engaged in questionable digital-option machinations. <u>See, e.g.</u>, <u>Historic Boardwalk Hall</u>, 694 F.3d at 449.

[27] We can imagine a case where one spouse may not be a formal party to the partnership agreement, but may otherwise indicate an understanding that he was bound by its terms. This is not the case here.

**[\*54]** property to it during its short lifespan.  This factor weighs against finding a partnership.

Principal v. Employee.  Mrs. Lawrence acted as neither principal nor employee of 466.  While in other contexts this fact could be neutral, here it underscores Mrs. Lawrence's lack of involvement with 466 and weighs against finding it to be a partnership.

Whether Business Was Conducted in Joint Name.  Until trial Lawrence (and Garza) did not hold Mrs. Lawrence out as being a member of 466, and she is nowhere mentioned in 466's records.  This factor weighs against finding a partnership.

Separate Books.  Lawrence and his wife did not keep separate books regarding their interests in 466.  But since we wouldn't usually expect a husband and wife business team to keep separate books, we'll call this factor at least neutral.

Mutual Control and Responsibility.  Mrs. Lawrence may have had an interest in 466, and may have been able to exercise some amount of control over its affairs under Texas law.  She did not--even in a perfunctory way--exercise whatever rights she had.  She had no responsibilities with 466 and didn't help Lawrence organize or "operate" the alleged business.  This factor weighs against finding a partnership.

**[*55]** <u>Parties' Control Over Income and Capital</u>.  The remaining two <u>Luna</u> factors require slightly more analysis.  As a spouse of 466's principal, Mrs. Lawrence may have had a community interest in Mr. Lawrence's partnership shares and a right to a share of any distribution of 466's surplus property or profits.  <u>See</u> Tex. Fam. Code Ann. sec. 3.002 (West 2006) (community property is property, other than separate property, acquired by either spouse during the marriage); <u>see also</u> <u>Smoot v. Smoot</u>, 568 S.W.2d 177 (Tex. Civ. App. 1978) (discussing whether an asset of partnership between husband and his father was husband's separate property or community property).  This quasi-interest does not, however, mean she could have controlled 466's property, income, or capital.

Under Texas law, a spouse retains "sole management, control, and disposition of the community property that the spouse would have owned if single."  Tex. Fam. Code Ann. sec. 3.102(a) (West 2006).  Since Lawrence would have been 466's sole owner if he were single, he retained sole management and control over it without regard for the community-property rights of Mrs. Lawrence.  And Lawrence's right as a formal partner to manage and control 466 is not itself community property.  <u>See</u> Tex. Bus. Orgs. Code Ann. sec. 152.203(a) (West 2012).

Mrs. Lawrence had no legal "right" to manage and control the income and capital that constituted 466 (such as it was).  Even if she had, she never exercised

**[\*56]** such rights or demonstrated any concern about whether they existed. This factor weighs against finding a partnership entity between Lawrence and his wife.

Return Filings. 466 filed a Form 1065 for its 2001 tax year in April 2002 listing 67 as its TMP. This return was not signed by Mrs. Lawrence, but was apparently signed by Lawrence on behalf of 67, which was in turn 466's general partner. 466 issued two Schedules K-1: one to 67 and the other to "Larry W. Lawrence, Jr."

While the return indicates that 466 held itself out as a federally recognized partnership, it also shows that 466 did not consider Mrs. Lawrence to be one of its partners. This underscores our finding that 466's characterization of Mrs. Lawrence as a partner is *post hoc* and self-serving. This factor weighs against finding it to be a partnership.

We have to conclude that Lawrence and his wife did not intend to "join together" to undertake business under 466, and that she was not a partner in this purported partnership.[28] Not a single Luna factor or other fact weighs in favor of finding a partnership entity, and several weigh heavily against it. During 2001 Mrs. Lawrence didn't know that 466 existed, and she took no part in its

---

[28] We could likewise have concluded on these facts that the spouse did not "own" a capital interest in 466 within the meaning of section 704(e).

**[*57]** management or control. She was not listed as one of its partners on its returns or agreements or any other document--including its account at DB Alex Brown. And she did not exercise dominion or control over either an interest in, or the assets of, 466. Despite the operation of Texas community-property laws--in fact consistently with them--she was not a partner of 466, and Lawrence and his wife must be treated as "one person." Cf. sec. 6231(a)(12) (under default TEFRA procedure, husband and wife are one person). Because we find 466 had only one participant, Lawrence, we find that it is disregarded under section 301.7701-3(a), (b)(1)(ii), Proced. & Admin. Regs.

### b. 541

We also find based on the facts and circumstances that Salazar's wife did not join with Salazar to form a partnership entity in 541. During 2001 she also didn't know that it existed, and did not have any management or other responsibility for the purported partnership. She was not listed as a partner of 541 on its federal return, agreements, or any other document, and she didn't receive a Schedule K-1. Salazar didn't hold her out as a partner of 541. Beyond a possible stake in Salazar's 541 interest, she had no dominion or control over 541 or its assets. Her name wasn't on 541's DB Alex Brown account. As with Mrs. Lawrence, Texas community-property laws don't make her a partner in 541, and she lacked the

**[\*58]** slightest indicia of joining together with her husband to conduct business as a partnership. She was not a partner of 541, and so Salazar and his wife must also be treated as "one person." Because we find 541 had only one participant, Salazar, we find that it too is disregarded under section 301.7701-3(a) and (b)(1)(ii), Proced. & Admin. Regs.

### c. 6611

Garcia's case is just the same. His wife, too, did not join with him to form a partnership entity in 6611. During 2001 she too didn't know that 6611 existed, and she didn't have any responsibility over or control of it or its assets. She too was not listed as a partner of 6611 on its returns, agreements, or any other document, didn't receive a Schedule K-1, and was not on 6611's DB Alex Brown account. She too wasn't held out as a partner of 6611. Like Mrs. Lawrence with regard to 466 and Mrs. Salazar with regard to 541, Mrs. Garcia demonstrated none of the indicia of being in a partnership entity with her husband, and we find that she wasn't. Like Lawrence and Salazar and their respective wives, Garcia and his wife must be treated as "one person." And since 6611 therefore had only one participant, Garcia, we find that it is disregarded under section 301.7701-3(a), (b)(1)(ii), Proced. & Admin. Regs.

**[\*59]**      2.      <u>Tax-Motivated Business Purpose</u>

There is a second and separate obstacle to any finding that these entities were partnerships:  A partnership does not come into existence for tax purposes until it begins its business activities.  <u>See</u> <u>Torres v. Commissioner</u>, 88 T.C. 702, 737 (1987). The caselaw is clear, however, that the pursuit of business activity in furtherance of tax avoidance "is no more a business purpose than actually engaging in tax avoidance."  <u>ASA Investerings P'ship v. Commissioner</u>, 201 F.3d 505, 513 n.6 (D.C. Cir. 2000), <u>aff'g</u> T.C. Memo. 1998-305.  The "absence of a nontax business purpose is fatal."  <u>Id.</u> at 512; <u>see also</u> <u>Boca Investerings P'ship v. United States</u>, 314 F.3d 625, 632 (D.C. Cir. 2003).  We therefore must ask specifically if the "parties intended to join together as partners to conduct business activity *for a purpose other than tax avoidance*."  <u>ASA Investerings</u>, 201 F.3d at 513 (emphasis added).

In the partnership agreements for 466, 541, and 6611, there is an identical laundry list of stated purposes for each partnership.  The primary purpose listed for each one, for instance, is "to make a [p]rofit, increase wealth, and provide a means for each [p]artner's [f]amily to become knowledgeable of, manage, and preserve [f]amily [a]ssets."  Even if we believe what the partnership agreements say (which we don't), courts have been reluctant to find that managing and preserving family

**[*60]** assets is a legitimate and significant nontax reason for establishing a partnership where the property doesn't require active management.  See, e.g., Estate of Bigelow v. Commissioner, 503 F.3d 955, 972-73 (9th Cir. 2007) (property contributed consisted of a house that was rented to a tenant), aff'g T.C. Memo. 2005-65; Estate of Rosen v. Commissioner, T.C. Memo. 2006-115, 2006 WL 1517618, at *7 (assets contributed consisted primarily of stocks, bonds, and cash, conducted no business activity and had no business purpose for its existence). Managing family assets just doesn't justify the existence of any entity that doesn't actively manage any property or carry on any business.

The record paints a narrower picture of why 466, 541, and 6611 were formed.  They were created shortly before Lawrence, Salazar, and Garcia purchased and contributed the options on yen and Canadian dollars.  The partnerships didn't hold those assets for long--less than a month--before they liquidated and distributed all of the remaining property to the purported partners. Garza's plan predetermined the mayfly-like lives of 466, 541, and 6611 from their hatching to their dispatching.  And we also find there wasn't a nontax need to form the partnerships to take advantage of any purported potential profits of investing in digital options and Canadian dollars.  We therefore find that the only purpose for 466, 541, and 6611 was to carry out a tax-avoidance scheme.  And we find

**[\*61]** Lawrence, Salazar, and Garcia never intended to run businesses under the umbrella of these entities, and will disregard 466, 541, and 6611 for tax purposes for this reason too.

### 3. Consequences of Disregarding 466, 541, and 6611

When we disregard a partnership for tax purposes, we are holding that the rules of subchapter K of chapter 1 of the Code (which contains the substantive law governing the income taxation of partners) no longer apply, and that we will deem the partnership's activities to be engaged in by one or more of its purported partners. A disregarded partnership has no identity separate from its owners, and we treat it as just an agent or nominee. See, e.g., Tigers Eye Trading, 138 T.C. at 94, 96 n.32, 99. But disregarding the partnership doesn't necessarily mean that the taxpayer's investment and all items reported by the disregarded partnership are permanently reduced to zero. Although we don't respect the form, we still need to deal with the substance of the transactions to the extent we have jurisdiction. See, e.g., ACM P'ship v. Commissioner, 157 F.3d 231, 262-63 (3d Cir. 1998) (allowing deductions for securities that had "objective economic consequences apart from tax benefits * * * even when incurred in the context of a broader transaction that constitute[d] an economic sham" (citations omitted)), aff'g in part, rev'g in part T.C. Memo. 1997-115; Tigers Eye Trading, 138 T.C. at 108-09 (stating we have

**[\*62]** jurisdiction under TEFRA to determine basis of property allegedly contributed to a purported partnership, even if the partnership never existed).

The Code tells us that TEFRA procedures will still apply in these cases as long as the purported partnership filed a partnership return--which 466, 541, and 6611 all did for 2001.[29] See secs. 6231(g), 6233; see also sec. 301.6233-1(b), Proced. & Admin. Regs. This means we have to determine in these cases any items that would have been "partnership items," as defined in section 6231(a)(3), and section 301.6231(a)(3)-1, Proced. & Admin. Regs., had 466, 541, and 6611 been valid partnerships for tax purposes. See Tigers Eye Trading, 138 T.C. at 97. This is the "hypothetical entity" approach. See id. at 148-49 (Halpern, J., concurring). We now turn to the FPAA and the pleadings to decide which items are still in play for us to decide.

---

[29] TEFRA applies generally to any partnership, but there is an exception for "small partnerships"--meaning those having 10 or fewer partners. Sec. 6231(a)(1)(B). But this exception doesn't apply if any partner is a "pass-through partner." Sec. 301.6231(a)(1)-1(a)(2), Proced. & Admin. Regs. A "pass-through partner" includes a "partnership, estate, trust, S corporation, nominee, or other similar person." Sec. 6231(a)(9). The Commissioner has determined this includes disregarded entities, see Rev. Rul. 2004-88, 2004-2 C.B. 165, and we agree. Since 466, 541, and 6611 all had single-member LLCs as partners, TEFRA procedures apply here.

**[\*63]** B.     <u>Capital Contributions and Distributions of Property</u>

The Commissioner adjusted 466's, 541's, and 6611's reported capital contributions and distributions of property. Given that subchapter K doesn't apply to a simple agency relationship, there can be no contributions to or distributions from a partnership that does not exist. <u>See</u> <u>id.</u> at 107. The property is effectively treated as if it hadn't been contributed to or distributed from the purported partnerships, and setting "Capital Contributions" and "Distributions of Property other than Money" to zero is appropriate. But that doesn't mean the underlying property has no substantive value. Since the basis (*i.e.* inside basis) of the allegedly contributed option contracts and Canadian money would both have been partnership items if the partnerships were respected, we have jurisdiction to determine them in this partnership-level proceeding.

With regard to the option contracts, each purported partner should have treated the foreign currency options as a single option spread: The long and short positions were part of one contract and couldn't have been separated as a matter of

**[\*64]** fact and law.[30]  Cf. sec. 1092 ("straddle" rules).  The long options that 0327,

0997, and 464 purchased as nominees of Lawrence, Salazar, and Garcia entitled

each purported partnership to receive millions of dollars from Deutsche Bank if the

long option was in the money when it expired--$8 million for 466, $8 million for 541,

and $10 million for 6611.  But each was also required to pay an almost equal

---

[30] The option legs were acquired on the same date, executed with the same counterparty, in the same foreign currency, contingent on identical facts, listed on a single transaction confirmation, and exercisable on the same date.  The parties simply placed bets on one fact:  the price movement of the yen over a stated price.  A single net premium was paid for the spreads--the difference between the long and short position.  And the experts in these cases credibly testified that Deutsche Bank would not have entered into the options unless they were treated as linked.  If the options were separable, Deutsche Bank's risk would be too great:  The TMPs in these cases lacked the financial capacity to pay the $4-$5 million premiums on the long options, and they lacked the financial capacity to pay the bank the millions of dollars that would have been due if the short option, standing alone, expired in the money.

In Helmer v. Commissioner, T.C. Memo. 1975-160, 1975 WL 2787, the taxpayers beneficially owned real property that was subject to an option.  Title to the optioned property was held by an escrow agent, and the partnership which granted the option received yearly option premium payments from the option holder, and listed those amounts as distributions to the taxpayers on the partnership's books and tax returns.  The taxpayers argued that the option payments were for a contingent liability because the option was still outstanding.  But we held that there was no contingent liability because the transaction underlying the option was still open, and the option premiums were not subject to forfeiture.  Unlike the taxpayers in Helmer, Lawrence, Salazar, and Garcia all lacked the financial capacity to close the option transactions, and so Helmer is readily distinguishable.

**[\*65]** amount to Deutsche Bank if the short option was also in the money on that day--$7,920,000 for 466, $7,920,000 for 541, and $9,900,000 for 6611.

The appropriate bases in the options are simply what 0327, 0997, and 464 paid for them. <u>See</u> sec. 1012(a). That's $40,000; $40,000; and $50,000, respectively. The appropriate bases in the Canadian money are likewise just what 0327, 0997, and 464 paid for it as nominees of and agents for Lawrence, Salazar, and Garcia, respectively; $750 for 466; $4,500 for 541; and $4,500 for 6611.

C.     <u>Ordinary Gain (Loss) Adjustments</u>

After the expiration of the options, 466 reported a $14,300 gain, 541 reported a $40,000 loss, and 6611 reported a $50,000 loss. The Commissioner is correct that there can be no "partnership" loss (or gain) where there are no valid partnerships. Yet the purported partnerships all bought and sold actual property for Lawrence, Salazar, and Garcia. TEFRA says that we look to the rules of subchapter K to discover our jurisdiction over items belonging to an unrecognized "partnership". If we had found 466, 541, and 6611 to be real partnerships, the digital-option pairs would have been partnership property. And since they expired in the hands of these partnerships, any gain or loss they would have given rise to would have been a partnership item. Since the Commissioner wants to adjust these items and we have jurisdiction, we must determine their tax treatment in this

**[\*66]** partnership-level proceeding, but without looking any further at the rules of subchapter K.

Section 183 disallows deductions for an activity not engaged in for profit, except to the extent it produces income. Section 183 speaks of the activities of "an individual or an S corporation," but we have agreed with the Commissioner that "section 183 of the Code applies to the activities of a partnership, and the provisions of section 183 are applied at the partnership level," Thompson v. Commissioner, 137 T.C. 220, 231 (2011) (quoting Rev. Rul. 77-320, 1977-2 C.B. 78), appeal filed (8th Cir. Mar. 26, 2012); see also, e.g., Krause v. Commissioner, 99 T.C. 132, 168, 176 (1992), aff'd sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994); Walford v. Commissioner, T.C. Memo. 2003-296, 2003 WL 22413166, at \*4, aff'd, 123 Fed. Appx. 952 (10th Cir. 2005). And section 301.6231(a)(3)-1(b), Proced. & Admin. Regs., plainly states that "[t]he term 'partnership item' includes \* \* \* whether partnership activities have been engaged in with the intent to make a profit for purposes of section 183."[31]

_____

[31] There may be some theoretical disagreement as to how section 183 operates to disallow deductions claimed by a partner that flow through to him from a valid TEFRA partnership: The Ninth Circuit has held that section 183 "applies to partnerships despite the statute's failure to mention them \* \* \*." Hill v. Commissioner, 204 F.3d 1214, 1218 (9th Cir. 2000). The Fifth Circuit, in contrast, has held that while "deductions for partnership expenses are not allowed or

(continued...)

[*67] 466, 541, and 6611 are not real partnerships--they are merely agents or nominees of Lawrence, Salazar, and Garcia, respectively. And this means their acts are treated as if they were done directly by their principals. 466 does not have an identity separate from Lawrence. 541 does not have an identity separate from Salazar. And 6611 does not have an identity separate from Garcia. We will therefore apply the rules of section 183 to 466, 541, and 6611.[32]

While a taxpayer need not be reasonable in expecting to make a profit, he must establish that he undertook the activity with a good-faith objective of doing

---

[31](...continued)
disallowed directly under [section] 183 itself," the section 183 factors help determine the requisite profit motive required by other Code sections. Copeland v. Commissioner, 290 F.3d 326, 335 (5th Cir. 2002), aff'g in part, rev'g in part T.C. Memo. 2000-181; see also McGann v. United States, 76 Fed. Cl. 745, 756-757 (Fed. Cl. 2007) (noting the different approaches taken by the Fifth and Ninth Circuits and siding with the Fifth). And the D.C. Circuit has no position on this point.

There may not be much of a conflict here--the Fifth Circuit was analyzing a real activity of a real partnership. In contrast, what we have here are tax nothings or mere "hypothetical entities," which we treat as if they were partnerships only as a matter of TEFRA procedure, see sec. 6233.

[32] The FPAAs also asserted that neither 541 and 6611 nor their purported partners entered into the option positions or purchased foreign currency or stock with a profit motive for purposes of section 165(c)(2). See Notice 2000-44, 2000-2 C.B. 255, 256 (citing Fox v. Commissioner, 82 T.C. 1001 (1984), for the proposition that "in the case of individuals, these [paired-option] transactions [that generate artificial tax losses] may be subject to challenge under [section] 165(c)(2)").

[*68] so.  See sec. 1.183-2(a), Income Tax Regs. ("Although a reasonable expectation of  profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the objective of making a profit").  In making this determination at the partnership level, we generally look to the actions of the promoter and general partner of the partnership.  See, e.g., Peat Oil & Gas Assocs., 100 T.C. at 276 ("[I]n determining whether the [p]artnerships had the requisite profit motive it is necessary to look at the motive and objectives of the promoters and the managers of the [p]artnerships" (citation and internal quotation marks omitted)), aff'd, Ferguson, 29 F.3d 101.  This means that we look at the motives of Garza, the transactions' promoter; and the managers of 466, 541, and 6611--who were also their TMPs.  Section 1.183-2(b), Income Tax Regs., lists a number of factors for us to consider:

- the manner of carrying on the activity;

- the expertise of the taxpayer carrying on the activity or his advisers;

- the time and effort of the taxpayer in carrying on the activity;

- the expectation that assets used in the activity will appreciate;

- the taxpayer's success in carrying on other activities;

- the taxpayer's history of income or losses with respect to the activity;

- the amount of occasional profits, if any;

[*69] •       the financial status of the taxpayer; and

•       whether the activity has elements of personal pleasure or recreation.

These factors are not exclusive, and we do not decide the issue on the basis of a single factor or a mathematical preponderance of factors.  See id.

Salazar testified that the tax benefits were not his primary reason for following Garza's investment strategy; instead, it was the shot at doubling his investment and a chance of making a lot more than that if the spot rate hit the "sweet spot."  Lawrence and Garcia gave us a similar explanation for their deals.  But we aren't convinced that any of them followed Garza's plan with the primary purpose of making a profit on the investment strategy.

The chance of a "sweet spot" payout was incredibly unlikely.  Deutsche Bank told Garza to assume that a sweet spot payout would never happen, and reasonably compared hitting the sweet spot to winning the lottery, in that there was a very "low probability [that it would happen] and by itself [was] not a good reason to do the [investment]."  The experts' reasonable computations of the theoretical probability of this event fell in the range of 0.13% to 0.25%.

But these lotteries were rigged:  Deutsche Bank was the calculation agent, which meant that it got to determine the spot-market exchange rate at a particular minute on a particular day that would in turn trigger the payoffs on the options.

[*70] And if Deutsche Bank followed industry market practices in determining the spot-market exchange rate, it would have asked three or four other banks or brokers to quote a "bid" price at which they would buy a currency and an "ask" price at which they would sell a currency. That means Deutsche Bank would have received a range of prices, and we have credible expert testimony that bid and ask prices are generally at least $0.03 apart. Because the strike prices in Lawrence's, Salazar's, and Garcia's contracts were only $0.02 apart, Deutsche Bank could choose a price outside the specified range and thus ensure that the options would never hit the sweet spot. We therefore find that the realistic likelihood of a sweet-spot payout was nil.

We also don't believe Lawrence's, Salazar's, and Garcia's claims that they did the trades and transactions that Garza suggested because they wanted a chance to double their money. Lawrence paid Deutsche Bank $40,000 for his options, Salazar paid $40,000, and Garcia paid $50,000. But these attorneys didn't investigate whether Deutsche Bank's prices were fair[33] or whether they could do the same investments somewhere else for less. The appropriate value of the option

---

[33] The Commissioner's experts estimated the options to be worth about $25,500 for Lawrence, $30,800 for Salazar, and $38,500 for Garcia. Had any of the business-savvy and entrepreneurial lawyers looked into the premium, they might've noticed Deutsche Bank was charging them at least 30-35% more than the options were worth.

**[*71]** pair is the value of the long option minus the value of the short option. The Commissioner's experts reasonably calculated the theoretical net value of each pair of options using the Black-Scholes model:[34] $25,500 for Lawrence, $30,800 for Salazar, and $38,500 for Garcia.

They also--and this is rather obviously important--didn't add Garza's fees into their profit analysis. Lawrence, Salazar, and Garcia each paid Garza $95,000 for these deals. That means that Lawrence paid $135,000 for a less-than-19% shot at $80,000, Salazar paid $135,000 for a less-than-14% shot at $80,000, and Garcia paid $145,000 for a less-than-14% shot at $100,000. (These probabilities are from

---

[34] The Black-Scholes model is a widely accepted formula for valuing European-style options on liquid assets. It relies on five variables: the exercise price of the option, the market price of the underlying asset, the volatility of the underlying asset, the expiration date of the option, and the risk-free interest rate. The Code doesn't require us to use the Black-Scholes valuation method, but we think it is a reasonable method for valuing the options pairs here.

The biggest weakness we can see in using the Black-Scholes model in this manner is that it doesn't account for Deutsche Bank's opportunity to fudge the partnerships' small chance for a big payday. It was statistically possible for the long options to be in the money when the short options weren't--but no more than a 0.25% chance. But Deutsche Bank had the sole authority to pick the exchange rate when the options terminated, and there was only a $0.02 spread in the strike prices. The Commissioner's experts credibly testified that the prices from which Deutsche Bank could choose routinely varied by $0.03, which means that the partnerships would hit the sweet spot only if Deutsche Bank decided it wanted to lose millions of dollars. The true value of the options is thus likely even lower than the Black-Scholes model tells us.

[*72] the Commissioner's experts, whose calculations we find more likely than not correct on this question.) The bet was a long shot before Garza's fees, and any potential for profit was completely eliminated once his fees were factored in. We therefore find that these options weren't purchased with the intent of making a profit, but were just part of Garza's plan to create tax benefits.

Garza told Lawrence, Salazar, and Garcia that for them to take advantage of the tax benefits, the transactions had to be done before the end of 2001. That is why these trades were executed in November and December of that year. Lawrence, Salazar, and Garcia wanted to reduce their tax liabilities on the money they got from their Firestone cases. That was their motive for buying the options and the Canadian dollars and contributing those assets to the partnerships.

Other than to exploit the partnership-tax rules, there was no reason for the options to be contributed to the partnerships. The partnerships didn't do anything with these options except hold them and then report a gain or loss when the contracts terminated. We find that the only reason for the acquisition of the foreign-currency options and Canadian dollars by the partnerships was to facilitate Garza's tax-avoidance scheme.[35]

---

[35] We also find--just because such factors are also mentioned in closer cases-- that 466, 541, and 6611 were not in the business of foreign-currency trading, and

(continued...)

**[*73]** Garza was not a certified investment adviser or certified financial planner. And he testified that the primary reason he tried to make his clients money on the options was that he believed it would then be easier to prove that his clients had a legitimate profit motive. The purchase of the foreign-currency options and Canadian dollars followed Garza's plan, but neither the partnerships nor the TMPs had seriously invested in foreign currency before Garza came along.

This means that none of the section 183 factors weighs in favor of finding a for-profit venture. The manner, expertise, and purpose of the investments--and Garza's and Lawrence's, Salazar's, and Garcia's own designs--centered wholly on tax avoidance. The activities were engaged in solely because Lawrence, Salazar, and Garcia wanted to shelter large amounts of income earned in their respective law practices. The charade had one purpose--tax avoidance--and we refuse to countenance self-serving *post hoc* revisionism to the contrary. We therefore find that the activities of 466, 541, and 6611 were not engaged in "for profit," but were only the means for carrying out a tax-avoidance scheme.

---

[35](...continued)
did not undertake foreign-currency trading with the intent of making a profit in later years (which should be obvious since the partnerships were all terminated at the end of that year).

[*74] The consequences of this finding are a bit different for each of the three hypothetical entities. 541 and 6611 reported losses on their Schedules K, Partners' Distributive Share Items, for 2001. Because we find that 541's and 6611's activities were not engaged in for profit, we sustain the Commissioner's determinations and adjust those losses to zero.

466 reported a small gain on the termination of the option contracts. The FPAA issued to 466, however, zeroed out the $14,300 of income reported on Schedule K, line 1, and Form 4797. Although this adjustment helps 466, Lawrence argued that the Commissioner erred in adjusting the net gain on Form 4797 of $14,300. We agree a bit with Lawrence that he made money in some sense (ignoring Garza's fee)--purely by mistake. But even on this small point, we find that 466 misreported what happened. On its Form 4797, 466 reported the "sales price" of the options as $54,300 and the partnership's basis in the property as $40,000. But the actual amount realized on the expiration of the options was $80,000, because the proposed offer to unwind the option for $54,300 did not go through. Therefore we have to adjust that item of income to $40,000--the difference between $80,000 and 466's basis of $40,000. But in the end, we get back to the same place the Commissioner pointed us to: Section 183 allows losses

**[\*75]** up to the amount of income even in the absence of a profit motive, and here Garza's fee for this scheme swallows up that $40,000 gain.

III.    Penalties

All that is left is the penalties the Commissioner seeks.  We have jurisdiction over these penalties at the partnership level because they "relate to" partnership-level adjustments:  We can adjust the amounts of partnership contributions and distributions in light of our determination that the partnership doesn't exist.

The Commissioner meets his burden of production on the penalty with simple arithmetic.  A gross valuation misstatement exists if the value or adjusted basis of any property claimed on the partnership return is 400% or more of the correct amount.  See sec. 6662(e)(1)(A), (h)(2)(A).  Each partnership reported an adjusted basis or value for Canadian dollars (described opaquely as distributions of property) that was well more than 10,000% of the correct value.  Any underpayment of tax attributable to those gross-valuation misstatements is subject to a 40% penalty.  See sec. 6662(h)(1).

The only issue in left in dispute is whether 466, 541, and 6611 had section 6664 reasonable-cause-and-good-faith defenses for the gross-valuation misstatement penalty.  We have held that a partnership can raise this defense to that

**[\*76]** penalty at the partnership level, see 106 Ltd., 136 T.C. at 76-77, and all three partnerships here do.

The gross-valuation-misstatement penalty can be rebutted by a showing of reasonable cause and good faith, sec. 6664(c), and a taxpayer will often argue (as all three lawyers here do) that he had reasonable cause and showed good faith by relying on professional advice. The regulation somewhat unhelpfully states that reliance on professional advice is "reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Sec. 1.6664-4(b)(1), Income Tax Regs. The caselaw lists three factors. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

- First, was the adviser a competent professional who had sufficient expertise to justify reliance?

- Second, did the taxpayer provide necessary and accurate information to the adviser?

- Third, did the taxpayer actually rely in good faith on the adviser's judgment?

All three lawyers--acting in their capacity as TMPs and general managers of their partnerships--claim reasonable reliance on Garza and Everhard as well.

**[\*77]** (Lawrence used Drefke to prepare some of his returns, but on brief did not claim to rely on Drefke's professional advice. For the reasons we summarized supra pp. 31-32, this would not have been successful).

We've already found that as a matter of fact that Everhard--though independent of the deal--told Lawrence, Salazar, and Garcia that he was not giving any of them a tax opinion and that they would have to rely on Garza for that. See supra pp. 30-31.

The question therefore becomes whether the partnerships' reliance on Garza's advice was reasonable and in good faith.

A.    Garza's Expertise

Garza was licensed and would have appeared competent even to a lawyer at the time the partnerships prepared their returns--at least to lawyers not versed in tax law, as these lawyers were not.

B.    Provision of Necessary and Accurate Information

We also find that the partnerships provided Garza with all the relevant financial data needed to assess the correct level of income tax. See sec. 1.6664-4(c)(1)(i), Income Tax Regs. Garza in fact generated most of that information and certainly had it all available.

**[\*78]** C.     Actual Reliance in Good Faith

It's the third point--the issue of the lawyers' actual good-faith reliance on Garza's professional advice--that's the major weakness in the partnerships' defenses:  Garza seems to fit the definition of a tax-shelter promoter.

The partnerships can't rely on Garza if he was.  The caselaw is clear on this point--promoters take the good-faith out of good-faith reliance.  See, e.g., 106 Ltd., 684 F.3d at 90-91, aff'g 136 T.C. 67; Neonatology Assocs., 115 T.C. at 98.  In 106 (another Garza case), we defined a promoter as "an adviser who participated in structuring the transaction or is otherwise related to, has an interest in, or profits from the transaction."  106, Ltd., 136 T.C. at 79 (quoting Tigers Eye Trading, LLC v. Commissioner, T.C. Memo. 2009-121, 2009 WL 1475159, at \*19).

We also decided in 106 Ltd. that we would apply this definition "when the transaction involved is the same tax shelter offered to numerous parties."  See id. at 80.  Based on the records in all these cases, we find again, as we did in 106 Ltd., that Garza not only participated in structuring the transaction, but arranged the entire deal.  It was he who set up the LLCs, provided a copy of the opinion letter, and coordinated the deal from start to finish.  And he profited from selling the transaction to numerous clients--not just these three lawyers, but numerous others

**[\*79]** as well.  Lawrence, Salazar, and Garcia all knew this.  Garza charged each of them a flat fee for implementing it and wouldn't have been compensated at all if they had decided not to go through with it.  He wasn't being paid to evaluate the deal or tweak a real business deal to increase its tax advantages; he was being paid to make it happen.

This makes him a promoter.  We therefore reject the partnerships' defense to the gross-misvaluation penalty.

Appropriate decisions will be entered.